The 4th District's Public Court of the State of Illinois has now convened, the Honorable Craig H. D'Armond presiding. Good afternoon, counsel. Good afternoon, your honor. Good afternoon, your honor. We'll call the case where 4-20-0453, Estate of Stokes v. Hogue. Is that Hogue? How? Hogue. Hogue. Two out of three and I got them both wrong. Could counsel, I understand that the appellant is going to be splitting their time between two counsel. Could you state your names for the record, please? Yes, Jennifer Bonesteel for the Estate of Lindsay Stokes by Shana Crittner. Judge, I would be the second. Stephen Mann, M-A-N-N, on behalf of the appellant, S-L-T, Incorporated. All right. Thank you, counsel. And counsel for the appellate, could you please state your name for the record? Yes, John Dalton for Mr. Hogue. And Ms. Bonesteel, Mr. Mann, who would like to proceed first? I believe I will be proceeding first, Your Honor. All right. Your Honors, if it please the court, this case actually was brought about by the result of an accident that occurred back in September of 2016, in which my client, Lindsay Stokes, a 16-year-old girl, was a passenger in her boyfriend, Jose Padilla's vehicle as he was delivering a pizza for SLD, Incorporated. SLD was owned by Dale and Leticia Stokes for grandparents. Jose Padilla attempted to cross an intersection without stopping at a stop sign, and the vehicle that was traveling in the through lane hit his vehicle. Both were knocked off the road, and Jose Padilla was instantly killed. Lindsay Stokes was life-flighted, but later died in the hospital the next day. However, the issues that bring us here actually start long before that. Back in, I believe, 2011, Mr. Hoff, Austin Hoff, became the insurance agent for the Stokes' and actually, in this case, for Pizza by Marjolini or SLD, Incorporated. Leticia Stokes had purchased this business from her old employer, who she used to work for at the same location, which was also Pizza by Marjolini, another pizza place. She had inherited the original auto insurance policies and then eventually sought to get a new, better policy from farmers to replace her old American family policy. She called up Mr. Hoff, and Mr. Hoff came out to inspect her business. He looked all over the restaurant. He inquired about the nature of her business, the nature of the ovens, the nature of the location. It is a small building with one table. In fact, all of her business is either carryout or delivery only. He knew she had delivery drivers. They discussed it. There is some dispute, a question of material fact, actually, as to whether or not she asked him to cover her whole business and whether or not that included her delivery drivers. With Ms. Stokes saying, yes, she asked everything to be covered, and Mr. Hoff saying she wanted just the same policy for a better price, and that's what he obtained for her. The failure to have the delivery drivers covered occurs when he obtains the same policy for her and when it does not, in fact, cover her delivery drivers. When no auto coverage is offered and she's not informed of the fact that she's not covered for her delivery drivers. That's when the breach occurs. I don't believe there's any dispute between any of the parties that that's when the breach occurs. So then becomes the question of what time does the statute of limitations begin to accrue for said breach? Now, both SLD and myself have taken the position that essentially the breach occurs then when he obtains these policies for her because a Hoff has a higher duty than your average person to obtain the right coverages, not, by the way, a duty of a fiduciary. There is case law on that. There's a statute on that. That's not what has been alleged, although there has been some communication, I think, breakdowns between lots of people in the trial court, lots of people amongst each other about this idea of a special relationship. But it is, in fact, higher than a person's. An ordinary care for an insurance agent is higher than your regular individual, but it's lesser than a fiduciary duty. Hoff also has a duty to notify them that basically Farmers doesn't offer these coverages and that they're not covered under their original policy when she's asking for everything to be covered. He didn't know whether or not they were covered, actually, when he was deposed. He didn't know and said he would need to ask an adjuster whether or not they would be covered. And yet he's still selling these policies without knowing for sure what the implications of these policies are. The Stokeses, actually, the breach occurs also because the Stokeses would have had more success filling out an application online, filling out the same application that Mr. Hoff filled out on their behalf without him bringing the laptop to her restaurant and having her fill out there while they're going over the questions together, because he answers some of the questions wrong. He answers no, there's no non-owned autos, and says when he's depositioned, well, those are for rentals. That's not the case. Non-owned autos are any business vehicles that the business doesn't own but employs. Letitia Stokes never gets asked that question, and so she doesn't know what applies to her. So then the question becomes, at that time, does Letitia Stokes have a duty to read and understand the policy, and did she breach her duty at that time, or was her delay in filing a claim because of the discovery rule applicable under these circumstances? And we argue, both SLD and I argue that, essentially, yes, it is delayed. Ms. Stokes did not understand that she was not covered, not only under this policy, but under her old policy. In fact, she believed she was covered under both. She asked for all of her business needs to be covered, even if they had read it, which is an undertaking in itself. These are not small documents, as I'm sure your owners are aware. These are large booklets of lots of information that it takes several attorneys, clearly, the ability to read and understand. But we are expected to read and understand them, aren't we? Well, so we are expected to try to read and understand if we can read and understand. But here's the thing, Your Honor, and this is a question… If I buy an insurance policy, am I not obligated to know the content of the policy? I think, actually, Your Honor, you might be under a little bit more of a standard since you're a judge. Okay, I'm just a small-town boy from Iowa, okay? Okay. And I buy an insurance policy, am I not expected to know what the terms of that policy are? Well, so the thing is, though, can you be expected to understand what the terms of the policy are? See, it's kind of a circular question. Yes, you have a duty to read and understand if you can do so. But in CROP, and in a lot of these cases, actually, what the Supreme Court of Illinois, from my understanding when trying to create this rule, is they're trying to keep people from looking at a policy and seeing on the very front cover, this only covers 80 percent, or this only covers $250,000 in coverage. Those are hard black-and-white numbers you can look at on the very first page of the policy and say, this is or isn't covered. It's not talking about reading and understanding every potential exclusion under a multitude of circumstances. Okay, so let me ask the question this way. Less than three years ago, the Supreme Court of Illinois in the case, American Family Insurance Company v. CROP, wrote this. Quote, when customers have the opportunity to read their insurance policy and can reasonably be expected to understand its terms, the cause of action for negligent failure to procure insurance approves as soon as the customers receive the policy, period, unquote. And that was their holding. The court used the language, when they have the opportunity to read the policy and can reasonably be expected to understand its terms. Now, as a matter of policy, I think maybe you're making a good point here, but we have to salute smartly and follow what the Illinois Supreme Court has said. They didn't have to say it, but they did say it. So I suppose the question is, on what basis can we distinguish what happened in this case from the holding in CROP? Well, actually, there's a couple of different bases, Shona, and I thank you for bringing it up in that fashion. In fact, CROP says, first of all, the CROP sued on a breach of fiduciary duty, not a standard of ordinary care as is required by the statute. And then the question that they had was whether or not they were covered. And the Supreme Court says, you could have been able to look at your policy and see on the very face of it that if you compared it to your old traveler's policy, it did not cover for emotional distress not related to bodily injury. That was on the very first page. In this case, however, there is a question, by the way, that I believe no one raised, but it is interesting. Hoff says they are the same, it's the same policy for this policy with farmers, and he got them the same policy they had with the American family. No one ever asked Letitia Stokes, did she read the American family policy? Because if they are, in fact, the same, and she read it, then one, there's a question of material fact, but if she read it, then she still didn't understand it. And she believes she was covered under both. So there is a question of material fact there, but also CROP is something that is clearly distinguishable, because the person could look at their two policies, compare them, and see that they were not the same, and that the missing coverage they had asked for was clearly missing on the front page. In this case, Letitia Stokes could not have looked at her old policy and her new policy and said, hey, there's something missing between the two. And, in fact, Mr. Hoff's counsel, when they're writing their brief, says, well, if you look at this exclusion G, you can see that they're clearly not covered. Except that's part and parcel of exactly what's wrong with this case. You can't just look at exclusion G. You also have to look at who's an insured, and who's an insured is not defined on the front page for Jose Padilla. Jose Padilla is not listed on the front page of that policy. Thank you. Thank you, Mr. Mann. Thank you, Your Honors. I want to cover that second prong of CROP. As to the holding, can you reasonably be expected? I think that, you know, in deference to that, one of the things that we haven't discussed is, let's say my client did understand everything that was being read. Would they have been aware of all of the injury that happened here? Would they have been aware of the full injury? And I guess I have to back up to what was actually being contracted for here. Because I think that there is a dispute being alleged that what was being asked for was, you know, the same policy, you know, similar to what was going on in the CROP case. But we certainly have provided, Your Honors, multiple facts that suggest that it was much broader than that. That what SLD was actually asking for as a pizza delivery business is all of their business insurance risks to be covered. So, if we start there with a difference of opinion. Counsel, let me ask you this. It seems like we're kind of going down the primrose path here. I mean, isn't the general rule under CROP that there's this obligation to read your policy? So, really, what is the relevance of she didn't get what she thought she was getting or he didn't give her everything she asked for? I mean, once we get to, once we answer the question of, did she read the policy, was she obligated to read the policy? And then doesn't the question become, did she file within the necessary period of time? Does the discovery rule apply or not? All of this about whether or not she got what she asked for or did she ask for it? What did he, you know, I don't understand really the relevance of all that. Well, yeah, that's a great question. Two things there. Number one, if she had a full knowledge of it, we have concerns that that was confused by the actions of the agent here. This is where our arguments regarding reasonable reliance on what he's telling her may be the case with this policy come into play. He's bringing up issues about her personal delivery drivers and whether or not they have coverage. He's indicating to her that he's an expert in this area and that she's she's getting the coverage. So that that that confuses the you know, whether or not she's expected to understand these terms and be clear on it in a complicated commercial policy. The other issue is, let's say she did understand this gap in coverage that not even the insurance agent was able to explain. What next? Well, we as we pointed out in our briefs, there was available coverages for this. There was an available endorsement that he didn't think this insurance company even had. We found out about it by way of a restaurant coverage form that was provided that actually had the delivery. So had she gone to Mr. Mann, basically, as you do in your brief, you're trying to establish some type of exception that some exception applies to the crop case here. And so, I mean, when we look at the cases that apply and exception. They're not the same as the facts that we have here, where we have outright representation to a perspective, ensure that, yes, this is covered, you know, statements made along that nature. How is this case like those cases, for instance, you cite gross, which, of course, is not an Illinois case, but you do cite it. Right. I cited from the standpoint that it's being the Supreme Court has indicated that there would be a narrow set of cases. And those narrow set of cases, at least the ones that I've read that were applicable, actually do have language in them regarding reasonable reliance on an agent. I believe the gross a case, maybe even fill up indicates that, you know, it's there are times that it's reasonable for for an insured for a potential insured to rely on the things that an agent is telling them. This is clearly a complicated area of insurance. Commercial insurance is not easy to understand. The different types of endorsements are not easy to understand. So our argument here is that, you know, in this circumstance, particularly when this coverage was available and should have been communicated, quite frankly, to the insured, that that's the real injury. The real injury was the omission to bring up, number one, the fact that this gap in coverage even existed. And number two, to provide some sort of way to remedy that, or at least to explain to our client, to my client, that we don't cover it and that there may be somebody else that could. And I believe that there is a case that's out there, maybe a seventh district case where a positive talks about, you know, you got to tell them that they that that coverage isn't available so they can go out and find it somewhere else that they don't sit around and wait for, you know, these types of cataclysmic events to happen before they go out and discover that they need. So I do think that reliance can, you know, obscure that issue as to what's reasonably expected to know. And really, none of those issues that I just brought up that are involved in this particular case were at hand in the crop case. I mean, crop was a very straightforward, where the insured actually even admitted what the contract was. The insured came straight out and said, we want the same exact policy as the prior policy. And the court indicated that, well, you could have looked at the traveler's policy, put it alongside of the of the new policy and determined that bodily injury wasn't wasn't a coverage. You know, all you had to do is look in the front page of each to determine that. We don't have those issues here. They're in that case where the insurance agent is saying, you know, I'm an expert in this area. We'll cover you. You know, we got this. We also don't have anything indicating that that coverage was potentially available. So I think it's a combination of those things that that that meets this crop exception here. And I do think that there's still those issues of material fact out there. I mean, if they're going to disagree as to what was actually agreed to up front. Well, how can you determine when the breach is if you don't know what the contract is? You know, and so, you know, I think those things need to breathe a little bit more at the trial court level. We never had really had a chance to have those arguments in the trial court. As I brought up earlier a little bit, your honors, you know, the fiduciary matter that was brought up, the idea of the special relationship is really just brought up to address the fact that the SLD, these folks were not shown to be complicated individuals. They were relying on this insurance agent to help them out. And as Ms. Bonesteel talked about the standard of care, there were so many ways that this could have gone right that it did. You know, number one, the insurance application in and of itself was not accurate. I mean, if he had simply gone through the insurance application with with this couple, they would have been able to they would have been able to go over the section of the application that talked about the different types of endorsements that would have been available for businesses that didn't own their own auto. That never happened. There was never any discussion regarding the actual corporation, despite the fact that the corporation's paying the premium checks. There were a number of things that could have probably been remedied early on if that happened. And it didn't. And these are things that we didn't you know, we didn't learn until this case started. After that, it was certainly imperative upon the agent to sit down with these folks, maybe on an annual basis, maybe every couple of years to determine is the business changed. You know, if it was a belief that the delivery drivers actually had satisfactory business insurance to cover them. Who were they? None of this happened. I keep coming back to your talking about all the things that weren't done. Can you tell us at what point what evidence is there of a situation where the agent insisted that a certain hazard was covered? I'm looking at the language in gross and then also in the language in block. Is there any evidence that the agent made a representation that something was covered that was not covered? We're having a lot of assertions of what wasn't done. But do we have any of those representations, anything along those lines in this matter? We don't we don't have a representation where the agent is saying specifically your your delivery drivers are covered under not on auto enforcement. The issue the issue never came up. There was no discussion about gaps in coverage at all. Apparently, it was his understanding that you just place the prior policy that you can hand it and take the work from the prior insurance company and pay it forward. That's what happened here. Thank you for your time. Thank you, Mr. Mann. Mr. Dalton. You're on mute, Mr. Dalton. Apologies. Please call her counsel. As I said, I represent Mr. Hoff. There's no genuine material issue of fact that exists in this case. The trial court summary judgment based on the central limitation limitation should be affirmed. You know, it is tragic that the Stokes has lost their granddaughter. But Mr. Hoff shouldn't be responsible for held responsible for lack of coverage based solely on sympathy. The trial court granted the summary judgment properly based on the application of the American family versus crop case. Simply put, SLD third party complaint was filed more than seven years after Mr. Hoff's claimed breach of duty occurred. So the two year statute of limitations, and will to insurance producers bars SLDs claim. The such summary judgment was properly granted and should be affirmed. The Stokes had seven years to get the insurance base. They say they now they now say they needed but did nothing about it. They cannot get around the fact that Ms. Stokes asked Mr. Hoff to get the same insurance that she had with American family, a lower premium. We cited to miss Stokes is deposition testimony in fact Mr man cited to it as well, where, and he said that was fancy lawyering or something but she actually did say, in the end when I asked her Did you ask for your drivers to be insured specifically. She said probably not specifically. I just told him to do the same as my other insurance was that's words out of her mouth. And that's, she, she got the same the same coverage, and with the same exclusion they admitted that both policies at the same exclusion, the auto exclusion. As so the new mid century policy have the exclusion, the American family policies, they had prior to that had the same exclusion, as we know from all, you know, numerous cases and regarding insurance producers, their duty is limited generally to what they're asked to go procure. And that's what Mr Hoff did Ms. Stokes admits receiving the mid century policy in 2011 soon after it was issued. Both Mr Stokes and Ms Stokes admit that the automobile exclusion was in the policy, just like it was an American family policy. And I'm not going to go through crop obviously we all are familiar with the facts and ruling and crop, but I will say. Note that they that as the court has noted this, the Supreme Court has held that a that the crops had a duty to read their policy to to learn of the claim breach when it was first purchase. Appellants try to muddy the waters here by arguing that one of the apparent exceptions noted in crop case, crop case apply here. First, this, I will, I intend that the supposed exceptions in crop don't obviate the policies holders duty to read the policy. That would encourage people to simply put their head in the sand and the Stokes has admitted that they did not read the policy here. Instead, those narrow those exceptions are narrow and certainly don't apply to here, apply here. So they argue that there's the policy holder reasonably could not be expected to learn the extent of coverage simply by reading the policy. However, this the in the DJ the declared judge judgment action in the central district of Illinois, on this very policy, the central district district ruled that the auto exclusion was clear, and that there was no coverage in this case. Albeit unfortunate that that was the ruling by the central district. It was, there was no ambiguity, according to the courts ruling in the central district, and that the argument that it's complicated the policy is complicated as commercial policy. Well, if you read the entire if you really want to coverage for a your drivers and you read the policy install auto exclusion in there. You might actually be tipped off to call your agent and say, wait, I don't understand this. But they didn't do that. And that's, I believe the point of crop is you at least have to read the policy so you can see if something's missing that you asked for, or thought you asked for. Second, they next they talk about, well I'll back up to that the they say that there's a special relationship between Mr Hoff or an insurance producer producer and its customers. However, there is no authority for that. The. Section 2201 clearly says that the duty is a duty of ordinary care and skill to procure policy that's requested. That's what Mr Hoff did here. They, they say that the relationship is special. It might be special as the court noted if Mr Hoff said, I'm going to go get you covered for everything anything you could ever imagine don't you worry, and you're gonna pay less, and if he was doing that, but he simply he was simply asked to replace the American family policy and see if he could do it for a lower premium. That's what he did. Finally, with regard to the reliance, the court also pointed out that there was no act, or actually Mr Amanda just stated that there was no overt statement by Mr. Hoff, that would give rise to reliance by the Stokes and SLD in such as it might such a game such as the grossie case reference, not we're not obviously agreeing that gross he would apply given it's an Indiana case, but I don't think they're in this case there's any evidence of an act by Mr. Giving rise to reliance. Finally, they, the appellee, the appellants talk about the application, and that Mr Hoff should have gone through the application with Miss Stokes. They ignore the fact that Miss Stokes actually signed a memorandum of application. It's called, I will pull it up here I have it. Excuse me. They say she signed a memorandum of application that represented that she. The end of sign represents and warrants that he she has applied for this insurance coverage and set forth above pursuant to an application into the insurance computer records hereby and hereby confirmed that he she supplied information so entered and warrants and represents that all such information is true and correct. So at some point, Miss Stokes provided some information and that information was the American family policy. She, she asked Mr. Hoff to go get the American family policy, or something that a comparable policy and he did that. Here the Stokes have the same obligation to read the policy is the crops. Either they didn't read the policy or they did and got the policy they wanted under Illinois law all causes of action brought against an insurance producer concerning the sale procurement plate or placement of an inch of insurance so many insurance must be neither she nor Mr. Stokes reviewed it. They did not follow up their party complaint against Mr. Ha until March 27 2018 over seven years after receiving the policy. These facts are in dispute. As such, the statute limitation bars SLD third party complaint and summary judgment was properly granted by the trial court. Thank you. Thank you, Mr. Miss bone steel. Thank you, Your Honors. I'd like to say with what started with what Mr. Dalton just said, quote, either they didn't read the policy or they got a policy they wanted. That is not the standard in crop. And if your honors don't look at the facts of this and compare them to the facts of crop, or a grossie or of lakeside or of scabbard s or any of the cases that were mentioned. All you're doing is you're saying that the duty is read the policy or nothing, then all you're doing all you're doing is kicking the cat can down the road, respectfully, because the thing is the next part of the next step, what they'll be arguing is that if they read the policy. And there was still mistaken they thought they understood what they did, they will say well they had a duty to understand it. Even if they were wrong, even if they thought they understood it. So, they're going to just shift the burden, and it's going to be no longer about the reading, it's going to be about the understanding. And they're going to say, well, you should have asked your agent, you should have asked your broker, you should have asked an attorney, you should have asked someone, all they're going to do is move the argument they're going to move the goalpost. And it doesn't change the holding of crop which says, basically, that these cases are fact intensive. Even if crop, though I was trying to lay out a bright line rule they were not the Supreme Court was not disregarding cases with individual facts, where a person comes to rely on an agent because of their representations, both words and actions. And that they, a person may understand their insurance needs, they may be able to read the policy and they still may not understand how the policy applies to them. I can tell you I've never read that Lakeside policy in that case versus Scottsdale. But as an attorney who does this fairly regularly, I can tell you it's not a surprise to me that didn't cover that the insurance policy didn't cover for a murder, because it's an intentional wrongful act and it didn't cover for a third parties wrongdoing. I know that as an attorney, but I wouldn't expect anybody off the street to know that. But the facts here weren't that they couldn't understand it, it's that they didn't even look at it until there was a crisis and then the crisis happened to be seven years later and that's when they finally come to the realization that oh, we weren't covered. That's why it's very important to look at the case law that says it is his representations can mislead them both facts and both words and actions. He doesn't have to say to them, you can rely on me, I've got you covered. I've got you a better policy, it covers this, he doesn't have to make those representations. Where in the record does it say that he said I've got your delivery drivers covered? May I answer your honor? Please. It does not say he does not say that he's got your delivery drivers covered. What he says is he comes out and makes representations to her that he's going to cover, because if he was just providing her the same policy she already had. He never needed to come out. He's trying to incentivize her reliance upon him by coming and doing the glad handing, and no surprise, she believes it. Thank you. Thank you. Mr man. Your Honor, I do. I do believe that Latisha indicates in her deposition, and I, and I'm sorry I don't have the site. Well I mean that that she asked for all of her insurance risks to be covered, including her delivery drivers. Then why, why would she also agree that she made the statement that she requires her delivery drivers to have their own insurance. Yeah, that's interesting that everybody agrees with that right. Yeah, that that issue came up, and I believe she testified that there was some confusion as to why he was asking that question she answered that she requires all their delivery drivers to have insurance because it's, it's a requirement, you know, by law. And so, there's, you know, there's a dispute as to what she was actual, why that was actually being brought up by her and why I was actually being brought up by, by law by the franchise. By law, she was, it was a state of Illinois law so she understood she, she wanted them to have it. It's interesting that you bring up the franchise it was that was a franchise name that was bought by this corporation. But the one thing I wanted to, to, to bring out is, you know, to me, the thing I've always struggled with this, the crop cases, does reading a policy tell you all of the injuries that you have. If there is, you know, because the contract we're talking about the, the breach is the breach of what's asked to be procured. And I, you know, here, it just seems to me that regardless of understanding the terms of the insurance contract. The fact remains that no one was told my client was not told that there was coverage specific coverage. My client didn't ask for an auto endorsement, specifically she didn't even know what that was. What she knew is she needed her business to be insured. And what the insurance agent knew is there was coverage endorsement wise that could have cut could could have addressed that. That to me is the real injury here that falls in the gap between, you know, injuries known by reading a policy or understanding exclusion and injuries that are caused by an agent, not doing their job. When asked to get a full business owners policy to cover one of the core risks of this business. And I would also maintain that there is there is Illinois law regarding special relationship we quote to restatement second second of towards 299 a it has a section right in there that's been adopted by Illinois that says, you know, an actor can make special representations, you know, I can make believe the person to believe that, you know, that they can that they have higher skill skill set in this area. So I think that that comes into play as well. I appreciate your time. Your time is up the court will take this matter under advisement court stands in recess. Thank you.